IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM C. COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:22-cv-00157-BL-KFP |
| | ) | |
| JEFFERSON DUNN, | ) | |
| COMMISSIONER ADOC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER**

Plaintiff William C. Coleman, an inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983 against the Defendants for deliberate indifference to his serious medical need. (Doc. 1). On September 29, 2025, the Defendants filed motions for summary judgment. (Docs. 75–78). On February 10, 2026, the Magistrate Judge recommended that the court grant the Defendants' motions for summary judgment. (Doc. 99). The Plaintiff filed objections related only to the Magistrate Judge's recommendation to grant Defendant Siddiq's motion for summary judgment. (Doc. 103).[1]

---

[1] The Plaintiff filed a motion to absolve from liability Defendants Dunn, Jones, Wexford Health Services, Jackson, Appling, and Reese for "any allegations characterized as deliberate indifference." (Doc. 96). The Magistrate Judge construed that motion as notice that the Plaintiff does not oppose those Defendants' motions for summary judgment. (Doc. 99 at 1).

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  A district judge must "make a *de novo* determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.").  A district court's obligation to "make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made" requires a district judge to "give *fresh consideration* to those issues to which specific objection has been made by a party." *United States v. Raddatz*, 447 U.S. 667, 673, 675 (1980) (internal quotations and citations omitted) (emphasis in *Raddatz*).

In the first ten pages of his objections, the Plaintiff merely restates his medical history that the Magistrate Judge thoroughly set out in her recommendation.  (Doc. 103 at 1-10; Doc. 99 at 3-11).  The Plaintiff also makes the same arguments in his objections that he made in his response to Dr. Siddiq's motion for summary judgment.  The Plaintiff argues that "[w]hile Dr. Siddiq may not have denied the timely eye injection treatments prescribed [by] Dr. Fortin, [Dr. Siddiq] did nothing to ensure they were carried out."  (Doc. 103 at 11).  The Plaintiff takes issue with Dr. Siddiq prioritizing his cataract diagnosis over his AMD diagnosis and argues

that both diagnoses "should have been followed with equal priorities." (Doc. 103 at 15). The Plaintiff argues that because Dr. Siddiq never "stress[ed] the importance of the follow up appointments for [his] eye injection treatments" and did not "inform Ms. Howard of the importance," Dr. Siddiq "showed deliberate indifference to [his] medical needs to prevent the progression of his AMD which would eventually cause total blindness." (Doc. 103 at 13-14). The Plaintiff also challenges the Magistrate Judge's reliance on Dr. Siddiq's attestation that he had no control over scheduling of and transportation to outside medical appointments for inmates. (Doc. 103 at 12).

The court adopts the Magistrate Judge's thorough "Factual Background," "Legal Standard," and "Applicable Deliberate Indifference Standard" sections. (Doc. 99 at 3-17). The court also agrees with the Magistrate Judge that the Plaintiff has shown that he has an objectively serious medical need. (Doc. 99 at 18-20). As the Magistrate Judge stated, the Plaintiff "initiated this action because he alleged that the failure of Dr. Siddiq (and others) to adequately address his AMD between April 7, 2021, and December 15, 2021, and again between December 15, 2021 and March 1, 2022, placed him at a serious risk of losing his eyesight." (Doc. 99 at 23 (citing doc. 1 at 5–7)). The Magistrate Judge correctly found that the "medical record supports a finding that [the Plaintiff's] wet AMD in his left eye required regular Avastin injections to slow progressive vision loss." (Doc. 99 at 24). The court agrees with the Magistrate Judge that the "record contains enough information to

support a finding that failing to attend to [the Plaintiff's] AMD in his left eye 'pos[ed] a substantial risk of serious harm." (Doc. 99 at 20 (quoting *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000)).

The Magistrate Judge concluded that the Plaintiff has not "brought enough evidence to show that the eight-month and eleven-week gaps in his Avastin treatments were due to Dr. Siddiq's deliberate indifference." (Doc. 99 at 24). The evidence in the record supports the Magistrate Judge's conclusion.[2] Viewing all the

---

[2] The Magistrate Judge found that the Plaintiff "has not provided sufficient evidence to overcome Dr. Siddiq's *assertion* that it was reasonable for him to rely on Dr. Bradford's opinion that only cataract surgery could ameliorate [the Plaintiff's] vision." (Doc. 99 at 24-25) (emphasis added). The Magistrate Judge stated that "Dr. Siddiq's actions as observable in the record indicate that he may have given more weight to Dr. Bradford's opinion that '[AMD] cannot be changed, but cataract surgery will improve vision,' over Dr. Gauldin's and Dr. Fortin's opinions—that wet AMD can be treated with anti-VEGF intravitreal (Avastin) injections, administered on a regular basis." (Doc. 99 at 23). The Magistrate Judge stated that "whether his belief was right or wrong, Dr. Siddiq believed he was responding reasonably to Coleman's risk of vision loss by prioritizing Coleman's cataract surgeries." (Doc. 99 at 25). The court does not agree with the Magistrate Judge's analysis. Though Dr. Siddiq's counsel made these arguments in his motion for summary judgment, argument in a motion is not evidence. Dr. Siddiq did not attest in his declaration, and the medical record does not show, that he gave more weight to Dr. Bradford's opinion and prioritized cataract surgery over treatment for wet AMD. Instead, after recounting many of the Plaintiff's medical records, Dr. Siddiq attested that

> Mr. Coleman's vision issues and necessary medical needs have at no time been delayed or denied.

> Mr. Coleman continues to be seen by Dr. Fort[i]n, as well as Dr. Heersink, both ophthalmologists, for his macular degeneration and cataracts.

> The medical staff at the Bullock County Correctional Facility have at all times and will continue to adhere to the medical recommendations of Mr. Coleman's ophthalmologists and eye and vision specialists.

evidence in the light most favorable to the Plaintiff, the court agrees with the Magistrate Judge that there is insufficient evidence from which a reasonable jury could conclude that Dr. Siddiq acted with subjective criminal recklessness. (*See* Doc. 99 at 21).

As the Magistrate Judge found, "the record reflects that Dr. Siddiq did not deliberately ignore Dr. Fortin's orders for six-week follow-up appointments during the disputed period—Dr. Siddiq's 'practitioner's orders' note that he acknowledged six-week follow-ups were needed on April 7 and June 2, 2021." (Doc. 99 at 24 (citing doc. 76-2 at 84)); *see also* (doc. 33-3 at 53; doc. 76-2 at 63-64). The Plaintiff indicated in his verified complaint that Dr. Siddiq had scheduled an appointment with Dr. Fortin on May 19, 2021, which the Plaintiff acknowledged was six weeks

---

> At no time have I, or the other medical providers and/or nurses at the Bullock County Correctional Facility, failed to adhere to the medical recommendations of Mr. Coleman's ophthalmologists.

(Doc. 76-1 at 13). The Plaintiff had to present enough evidence from which a jury could reasonably find that Dr. Siddiq was deliberately indifferent, and the Plaintiff had to present evidence to dispute Dr. Siddiq's attestations and the medical evidence in the record showing that Dr. Siddiq was not deliberately indifferent to the Plaintiff's serious medical need. The Plaintiff did not have to present sufficient evidence to overcome an argument or assertion in Dr. Siddiq's summary judgment motion.

The Magistrate Judge also stated that "[a]lternatively, Dr. Siddiq may have failed to distinguish between dry and wet AMD—the former which has no treatment, and the latter which does." (Doc. 99 at 23). The Magistrate Judge stated that "Dr. Siddiq's actions may indicate that he misunderstood [the Plaintiff's] diagnosis" of wet AMD and that the "record demonstrates that Dr. Siddiq did not understand or realize Dr. Fortin's distinction between wet and dry AMD and their different treatment options." (Doc. 99 at 24). The court disagrees with this analysis. Dr. Siddiq's affidavit makes clear that he understood the nature of a wet AMD diagnosis and knew that Avastin "is injected into the eye to help slow vision loss" from wet AMD. (Doc. 76-1 at 3-4, 7).

5

after the April 7, 2021 appointment, but "no transportation showed up." (Doc. 1 at 6).[3]  In a May 26, 2021 "Sick Call Request," the Plaintiff indicated that his last eye injection was seven weeks prior, that he was "supposed to go every six weeks," and that he was "noticing deterioration in his vision." (Doc. 33-1 at 53).  He requested that Dr. Siddiq schedule an eye injection. (Doc. 33-1 at 53).  RN Scroggins referred the Plaintiff for a follow-up with Dr. Siddiq on June 1, 2021.  (Doc. 33-1 at 53).  Although hard to read, Dr. Siddiq's notes from June 1, 2021 seem to indicate that the Plaintiff missed an eye injection appointment on "5/6/21" but he still had a follow up in June; Dr. Siddiq indicated he "will submit again." (Doc. 33-1 at 40; Doc. 76-2 at 80).

In response to the Plaintiff's June 15, 2021, "health care grievance" stating that it had been ten weeks since his last eye injection appointment, LPN Appling replied that he had an offsite appointment scheduled.  (Doc. 1-2 at 1).  In response to the Plaintiff's October 20, 2021, "Alabama Inmate Grievance" regarding his lack of eye injection appointments, an unknown staff member wrote that the Plaintiff's

---

[3] The Magistrate Judge stated that the Plaintiff "had to rely on Bullock staff to schedule his appointments" and that "[b]eyond making the referral, Dr. Siddiq had no control over the appointment process, including scheduling and getting [the Plaintiff] to an appointment." (Doc. 99 at 26).  However, Dr. Siddiq attested that he "can make and request approval for referrals for an inmate to visit an outside, free work specialist and *work to schedule such an appointment*, if deemed necessary based on [his] best, medical clinical judgment." (Doc. 76-1 at 14) (emphasis added).  The record reflects that Ms. Howard, an employee of Wexford, makes the appointments at Dr. Siddiq's direction.  (*See* Doc. 76-2 at 4, 54).  When the court says Dr. Siddiq made an appointment, it means Dr. Siddiq through Ms. Howard.

"eye injection appointment ha[d] been rescheduled." (Doc. 1-4).  A November 16, 2021, "Inmate Request Slip" indicated that the Plaintiff had an "upcoming [appointment] for eye injection." (Doc. 1-5).  He had an eye injection in his left eye on December 15, 2021.  (Doc. 1 at 7).  The Plaintiff indicated in his verified complaint that he had an eye injection appointment scheduled on February 1, 2022, but "no transportation showed up," and that he had an eye injection at his March 1, 2022, appointment.  (Doc. 1 at 7).  The Plaintiff does not dispute these records.

Between May and December 2021, the record also reflects that appointments scheduled for August 17, October 7, and November 16 and 29, 2021, had to be rescheduled because Security Services did not show up to transport the Plaintiff to the appointment.  (Doc. 1-3; doc. 33-1 at 43, 49; doc. 33-3 at 28; doc. 76-2 at 66, 70, 72).  The October 7, 2021, appointment with Dr. Fortin for an eye injection was rescheduled for November 16, 2021.  (Doc. 33-3 at 28).  The record shows that Dr. Siddiq made an appointment with Dr. Heersink for the Plaintiff's *cataracts* on May 5, 2021, that was rescheduled for June 30, 2021, then October 19, 2021, and then November 21, 2021.  (Doc. 33-3 at 30, 39, 40, 43, 49–51).  Dr. Siddiq also made an appointment for August 20, 2021, that was rescheduled for September 8, 2021. (Doc. 33-3 at 30, 39, 40, 43, 49–51).  Based on the above records showing that the Plaintiff had eye injection appointments scheduled during the times in question, it is reasonable to infer that the August 17 and November 29 appointments, which did

not correspond with the dates scheduled with Dr. Heersink for the Plaintiff's cataracts, were for the Platiniff's follow-up appointments with Dr. Fortin for his wet AMD.  The Plaintiff has produced no evidence to show otherwise.

On this record, a reasonable jury could not find that Dr. Siddiq acted with criminal negligence in failing to schedule appointments to treat the Plaintiff's wet AMD during the times in question.  On the contrary, the record shows that Dr. Siddiq scheduled appointments for the Plaintiff's wet AMD follow-ups during the times in question, but that those appointments had to be rescheduled because transportation services did not show up to take him to the appointments.  Dr. Siddiq stated in his affidavit:

> I have no control over when an outside, free-world specialist has an opening in their schedule and/or availability to see an inmate.  Furthermore, I have no control over scheduling and administering the transportation and administrative nature of scheduling transportation for inmates from a correctional facility to outside, free-world appointments. Scheduling and administering outside transportation to free-world appointments, and the security and administrative requirements necessary for the same, are tasks performed solely by the ADOC and its employees and are outside of my control.

(Doc. 76-1 at 14).  The Plaintiff has presented no evidence to dispute Dr. Siddiq's attestation that he had no control over when outside doctors had openings in their schedule for initial and rescheduled appointments.  Moreover, the Plaintiff has produced no evidence to show that Dr. Siddiq had control over transporting the

8

Plaintiff to scheduled follow-up appointments to treat his wet AMD in his left eye. The Plaintiff argues in his objections that the "appointments that had to be rescheduled due to the lack of transportation by Security Services could have been avoided had Dr. Siddiq informed the Warden of the need for the 4 to 6 week follow up for eye injection treatments." (Doc. 103 at 14-15). But the Plaintiff presents no evidence to support his argument. The court agrees with the Magistrate Judge that the Plaintiff "provides no evidence suggesting" that Dr. Siddiq could have done more to ensure that the Plaintiff maintained appointments with Dr. Fortin every six weeks. (Doc. 99 at 26).

Because the record shows that Dr. Siddiq scheduled appointments to treat the Plaintiff's wet AMD during the times in question; those appointments had to be rescheduled because of a lack of transportation; and Dr. Siddiq had no control over transporting the Plaintiff to those appointments, the Plaintiff has failed to produce sufficient evidence from which a jury could reasonably find that Dr. Siddiq was deliberately indifferent to the Plaintiff's serious medical need during the times in question.

The Plaintiff objects to the Magistrate Judge's reliance on Dr. Siddiq's attestation that "scheduling and transportation 'are tasks performed solely by the ADOC and its employees and are outside of [his] control.'" (Doc. 103 at 12) (quoting Doc. 99 at 27)). The Plaintiff argues that Ms. Howard, an employee of Wexford

Health Servies at Bullock, was responsible for scheduling appointments, not ADOC, and that Dr. Siddiq, as the Medical Director over Ms. Howard, was responsible for ensuring that he attended off-site appointments every four to six weeks for Avastin eye injections. (Doc. 103 at 12-13). To be clear, Dr. Siddiq did not attest that ADOC was responsible for scheduling outside medical appointments for inmates. To the contrary, Dr. Siddiq attested that he "can make and request approval for referrals for an inmate to visit an outside, free work specialist and *work to schedule such an appointment*, if deemed necessary based on [his] best, medical clinical judgment." (Doc. 76-1 at 14) (emphasis added). Dr. Siddiq stated in his declaration that "scheduling and administering of *transportation*" were "tasks performed solely by the ADOC and its employees" and that he has no control over the "security and administrative requirements necessary" to schedule and administer transportation to "free-world appointments." (Doc. 76-1 at 14). The word "scheduling" before "and administering of transportation" in Dr. Siddiq's affidavit refers to scheduling transportation to the medical appointments, not the scheduling of the medical appointments themselves.[4] The Plaintiff has not produced any evidence to dispute that Dr. Siddiq had no control over scheduling and administering transportation for inmates to outside medical appointments.

---

[4] The Magistrate Judge stated that "Dr. Siddiq attested that scheduling and transportation 'are tasks performed solely by the ADOC and its employees and are outside of [his] control." (Doc. 99 at 27 (quoting doc. 76-1 at 14)).

The Plaintiff also asserts that Warden Jones's declaration in which she attests that she was not personally involved with the Plaintiff's medical care or treatment shows that ADOC was not responsible for "scheduling off site appointment[s]" or "transportation scheduling." (Doc. 103 at 13 (citing Doc. 75-2 at 2)).  However, the fact that Warden Jones was not involved personally with the Plaintiff's medical care does not show that ADOC was not responsible for transporting inmates to outside medical appointments.  The Plaintiff makes this argument but offers no evidence to show that Dr. Siddiq had control over transporting inmates to outside medical appointments and deliberately failed to transport the Plaintiff to scheduled appointments.

Moreover, the court agrees with the Magistrate Judge that the Plaintiff's own assertions that Dr. Siddiq did "'not seem to understand the critical importance of follow-ups when appointments are missed'" and that he "'lacked an awareness of [the Plaintiff's] need for injections'" do not support that Dr. Siddiq acted with "deliberate indifference" or "criminal recklessness."  (Doc. 99 at 24 (quoting doc. 97 at 2, 5)).  The court agrees with the Magistrate Judge's conclusion that "the evidence of record does not indicate that Dr. Siddiq affirmatively knew [the Plaintiff's] AMD could be improved and deliberately chose not to take actions that supported its improvement."  (Doc. 99 at 24).

11

The court agrees with the Magistrate Judge's analysis regarding the remaining Defendants' motions for summary judgment. (Doc. 99 at 27-41).

After careful review of the file and upon consideration of the recommendation of the Magistrate Judge, the court **OVERRULES** the Plaintiff's objections as to the Magistrate Judge's recommendation regarding Dr. Siddiq's motion for summary judgment (doc. 103); **ADOPTS** the recommendation of the Magistrate Judge as clarified in this order (doc. 99); **GRANTS** the Defendants' motions for summary judgment (docs. 75, 76, 77, 78); and **DENIES AS MOOT** the Plaintiff's Motion to Absolve Named Defendants (doc. 96).

The court will enter a separate final judgment.

**DONE** and **ORDERED** on this the 15th day of April, 2026.

BILL LEWIS
UNITED STATES DISTRICT JUDGE

12